## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROSEMARIE LAVIERO | : | Case No. 3:18-CV-2065 (OAW) |
| *Plaintiff*, | : | |
| v. | : | |
| | : | |
| CITY OF BRISTOL, | : | |
| INLAND WETLANDS COMMISSION, | : | |
| WALTER VESELKA, P.E., P.W.L.F., | : | |
| PAUL STRAWDERMAN, P.E. | : | |
| RAYMOND A. ROGOZINSKI, P.E., | : | |
| BL COMPANIES, INC., | : | |
| DEREK KOHL, P.E., | : | |
| SCHULTZ CORPORATION | : | |
| *Defendants.* | : | AUGUST 29, 2022 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Rosemarie Laviero ("Plaintiff") brings this action for claims arising from the construction of a municipal tunnel (known as a "culvert"), which encroaches onto her property at 246 Matthews Street in Bristol, Connecticut.  Plaintiff asserts claims against the City of Bristol, the Bristol Inland Wetlands Commission ("IWC"), and several city engineers: Walter Veselka, Paul Strawderman, and Raymond Rogozinski (collectively, the "City").  She also asserts claims against the City's engineering and construction contractors: Schultz Corporation ("Schultz"), and BL Companies, Inc. and its employee Derek Kohl (together, "BL").  Plaintiff alleges that in 2008, the City, Schultz, and BL (together, "Defendants") reconstructed the existing culvert on her property without her permission, and without obtaining an easement for the repair and reconstruction of the culvert.

The Amended Complaint asserts claims of trespass, nuisance, unlawful taking under the Fifth and Fourteenth Amendments of the Constitution, and the City's violation

of its own wetlands regulations and the Environmental Protection Act.  The City, Schultz, and BL have each moved for summary judgment on all counts.  *See* City's Mot. for Summary Judgment ("City's MSJ"), ECF No. 96; Schultz's Mot. for Summary Judgment ("Schultz's MSJ"), ECF No. 89; BL's Mot. for Summary Judgment ("BL's MSJ"), ECF No. 93.  Plaintiff has filed a 12-page opposition brief to all three summary judgment motions and has appended more than 800 pages of documents to her brief.  Pl.'s Opp., ECF No. 104.  Plaintiff's opposition, however, fails to respond to the vast majority of arguments set forth by Defendants.  For the reasons stated herein, the City's motion for summary judgment hereby is **GRANTED**; BL's motion for summary judgment hereby is **GRANTED**; and Schultz's motion for summary judgment hereby is **GRANTED**.

## I.  **FACTS**

The following facts are taken primarily from the parties' Local Rule 56(a) Statements of Undisputed Facts.  *See* Schultz's L.R. 56(a)(1) Stmt., ECF No. 91 ("Schultz Stmt."); BL's L.R. 56(a)(1) Stmt., ECF No. 95 ("BL. Stmt."); City of Bristol's L.R. 56(a)(1) Stmt., ECF No. 96-3 ("City's Stmt."); Pl.'s L.R. 56(a)(2) Stmts., ECF No. 105, 106, 107 ("Pl. Stmt.").  Additional facts are incorporated as necessary, to the extent there exists support in the record.  All ambiguities are construed in Plaintiff's favor.  All facts are undisputed, unless indicated otherwise:

In 2005, Rosemarie Laviero ("Plaintiff") purchased an undeveloped plot of land located at 246 Matthews Street, Bristol, Connecticut (the "Property").  Pl. Stmt., ECF No. 105 at ¶¶ 10, 12.  She purchased the plot as an investment, with the hopes of constructing and selling a single-family home.  Laviero Dep., ECF No. 104-22, 26:8–1.  Plaintiff paid $36,500 for the plot from the City in a tax lien foreclosure.  Pl. Stmt., ECF No. 105 at ¶¶

10–11.   The front of the Property abuts an unnamed brook that passes underneath Matthews Street through a culvert.  *Id.* at ¶ 7.  The City and Plaintiff agree that the existing culvert infringed on her Property.  *Id.* at ¶ 24.  Indeed, at the time of purchase, the Property line bisected the unnamed brook (and the culvert), with half of the brook on the City's property, while the other half of the brook was on Plaintiff's Property.  *See* BL's Existing Conditions Plan, ECF No. 104-13; Pl. Stmt., ECF No. 107 at ¶ 3.  At the time of purchase, Plaintiff knew where the property lines were, and she saw the presence of the culvert. Laviero Dep., ECF No. 104-22, 17–19; 226:10–12.  The then-existing culvert was constructed in 1939 with stone masonry, and the unnamed brook ran directly underneath:



*See* BL Preliminary Engineering Report ("BL PER"), ECF No. 95-8.

On January 4, 2007, Plaintiff applied to the City's Inlands Wetlands Commission ("IWC") for a wetlands permit to build a single-family home on her undeveloped plot.  Pl. Stmt., ECF No. 105 at ¶ 18; Permit Application, ECF No. 110-41.  The City, however, had plans to reconstruct the aging culvert.  On January 26, 2007, the City issued a Request for Proposal for engineering services for the reconstruction/replacement of the Matthews

Street culvert (the "RFP").  *Id.* at ¶ 21.  The City's RFP specified that "[t]he project consists of the reconstruction/replacement of the culvert along with channel improvements to the brook if necessary . . . . [including] the replacement of the existing retaining wall[.]"  RFP, ECF No. 96-11 at 3.  The City received a bid from BL on February 7, 2007.  Pl. Stmt., ECF No. 107 at 21, ¶ 7.

While the City was in the process of obtaining bids for the RFP, the IWC moved forward with Plaintiff's wetlands permit application.  On February 20, 2007, after a field inspection of the Property and a public hearing, the IWC held a meeting on Plaintiff's application to construct a single-family residence.  Pl. Stmt., ECF No. 105 at ¶ 25; IWC Meeting Minutes, Feb. 20, 2007, ECF No. 96-12 at 3–8.  Raymond Rogozinski ("Mr. Rogozinski"), the Assistant City Engineer, attended the public hearing and informed the IWC of the City's intent to replace the culvert.  Pl. Stmt., ECF No. 105 at ¶ 26.  Mr. Rogozinski recommended that a conservation easement be placed twenty feet off the property lines so that Plaintiff could not clear more than twenty feet from the house.  IWC Meeting Minutes, Feb. 20, 2007, ECF No. 96-12 at 3.  Mr. Rogozinski elaborated that the City had plans to replace the retaining wall because it is in a deteriorating condition, and the City would like to have a conservation easement.  *Id.*  Accordingly, the IWC voted to grant Plaintiff a wetlands permit, subject to its standard stipulations, and an additional stipulation requiring a conservation easement:

> "19. Establish a Conservation Easement within front and back yard setback. Referenced easements shall allow for the installation of proposed driveway and future repair / replacement of retaining wall / culvert."

Notice of Permit Approval, ECF No. 104-2.  Although Plaintiff received her wetlands permit on February 20, 2007, she did not begin construction on the home until

4

November 2010.  During this period, the City commenced its project to replace the existing culvert on Plaintiff's property.

<u>The Culvert Replacement Project</u>

On June 20, 2007, the City awarded BL a $50,900.00 contract for engineering services for the reconstruction/replacement of the Matthews Street culvert outlined in the City's RFP.  Pl. Stmt., ECF No. 107 at ¶ 5; Notice of RFP Award, ECF No. 95-31.  Derek Kohl was the Director of Transportation Engineering at BL and supervised BL's design work for the project.  Pl. Stmt., ECF No. 107 at ¶ 6.  Pursuant to the RFP, BL was retained by the City to develop a preliminary engineering report, and to provide design services for the project.  *Id.* at ¶ 8.  BL was not responsible for the performance or supervision of the physical construction work.  *Id.*

On December 21, 2007, BL submitted its preliminary engineering report ("PER") to the City.  PER, ECF No. 95-8.  The PER provides a historical description of the existing culvert (referred to as the "Matthews Street Bridge").  *Id.* at 3. The culvert was built in 1939 and contains two catch basins.  *Id.*  Catch basins are a form of stormwater management wherein a basin or other hole is inserted in the ground, and covered by a grate, to "catch" rainfall or any runoff surface water.  As described by Mr. Kohl, "[t]he storm water runoff goes directly into the grate and discharges into the watercourse[.]"  IWC Meeting Minutes, ECF No. 96-15 at 5 (March 17, 2008).  The grates were installed directly into the concrete of the culvert.  *Id.*  BL's report notes that "[t]he two locations where catch basin grates were cut into the concrete deck show the most deterioration . . . . The reinforcing bars left in place have corroded severely . . . . The result of these grates has locally weakened the structure substantially."  PER, ECF No. 95-8 at 6.  Aside from the

issues with the catch basins, BL discovered that the concrete overlay on top of the culvert (i.e., the bridge over the brook) contained pavement cracks with visible settlement. *Id.* BL also concluded that the replacement of the existing retaining wall was critical due to the potential for the failure of the roadway in a major storm event. *Id.* Moreover, significant erosion and scour existed at the site and on Plaintiff's Property. Pl. Stmt., ECF No. 107 at ¶ 11. BL recommended a box culvert designed with flared wingwalls to "help divert the water into the inlet." PER, ECF No. 95-8 at 9. The design was also meant to "prevent scouring and ensure proper anchorage to the earth." *Id.*

In addition to the preparation of the PER, the City's RFP also required BL to prepare the necessary permit applications for the project. Pl.'s Stmt., ECF No. 107 at ¶ 13. BL determined that the only environmental permit necessary for the culvert replacement project was a wetlands permit from the IWC. *Id.* at ¶ 15. Neither a permit from the State of Connecticut nor a permit from the U.S. Army Corps of Engineers ("USACE") would be required. *Id.* On February 8, 2008, the City applied to the IWC for a wetlands permit to replace the culvert. Permit Application, ECF No. 110-82. Plaintiff and BL disagree as to whether BL also was responsible for drafting the easements that would be needed for the City. *Id.* at ¶ 12. The City's RFP contains a "Scope of Services" section that requires the City's contractor, which is BL, to "[p]repare property mapping for all partial and total property and easement acquisitions required for the project." RFP, ECF No. 96-11 at 4.

BL argues that it was responsible for merely *identifying* any easements that were required, not for *drafting* the easements themselves. BL's Stmt., ECF No. 95 at ¶ 12. Accordingly, BL's PER identifies Plaintiff's property as having "right-of-way impacts" for

which "Permanent Easement & Construction Rights" should be acquired.  PER, ECF No. 95-8 at 5.   However, no written easement agreement was ever prepared by BL, nor executed between Plaintiff and the City.   The City maintains that it did not need an easement to reconstruct and repair the culvert.  Pl.'s Stmt., ECF No. 105 at ¶ 52.

On March 5, 2008, the City and BL held a public meeting to explain its design for the culvert replacement project, and to answer questions from local residents.  Pl. Stmt., ECF No. 107 at ¶ 47; Meeting Minutes, ECF No. 95-21.  Plaintiff attended the meeting. Pl. Stmt., ECF No. 107 at ¶ 47.   At the meeting, BL presented the project in detail and summarized the recommendation for a full structure replacement.  Meeting Minutes, ECF No. 95-21.  *Id.*  On April 21, 2008, the IWC formally granted the City a wetlands permit to begin construction on the culvert.  *Id.* at ¶ 18.

On May 13, 2008, the City awarded Schultz a construction contract in the amount of $477,665.75.  Pl. Stmt., ECF No. 106 at ¶ 10; ECF No. 110-11.  The new culvert, as designed by BL and constructed by Schultz, was larger than its prior version and moved further north into Plaintiff's Property:



Vertex Comparison, ECF No. 104-32 at 12 (highlighting prior culvert in red and new culvert in blue); Laviero Dep., ECF No. 104-22, 148:2–10.  The new culvert was consistent with BL's design: a 9' x 6' precast concrete box with a chain link fence:



Final Construction Completion, Vertex Report, ECF No. 92-5 at 26, Figure 21.

As shown in the Vertex Comparison above, the City moved the new culvert further east and further north into Plaintiff's Property.  Vertex Comparison, ECF No. 104-32 at 12; Laviero Dep., ECF No. 104-22, 148:2–10.  Moreover, an entire wingwall is now on Plaintiff's Property.  Vertex Comparison, ECF No. 104-32 at 12.  The new location, however, was designed to accommodate the proposed driveway in the site survey previously submitted by Plaintiff to the IWC for her permit.  *Compare* Wetlands Disturbance Plan, ECF No. 110-24, *with* Zoning Location Survey Site Plan 12/27/2006, ECF No.110-42.

Schultz substantially completed its construction of the new culvert in December 2008.  Pl.'s Stmt., ECF No. 106 at ¶ 12.  At that time, Plaintiff visited the Property and did not like how the completed culvert looked.  *Id.* at ¶ 14.  She contacted the city to express her displeasure at the installation of the chain link fence, and the culvert's wingwalls.  *Id.* at 16–17; ECF No. 110-102.

The City made final payment on the culvert construction project to Schultz on June 22, 2010.  Final Payment Release, ECF 92-4.

Laviero Construction

On September 21, 2010, Plaintiff wrote a letter to the City to address her concerns about the new culvert.  Pl. Stmt., ECF No. 105 at ¶ 65; Letter to City, ECF No. 110-106. The letter expressed concerns about the unsightly black fence, a guard rail that was blocking Plaintiff's only entrance to the property, an issue with the stream bank washing out, and lack of landscaping.  *Id.*  The City met with Plaintiff and her son, John Laviero, on September 23, 2010 to address the issues.  Pl. Stmt., ECF No. 105 at ¶ 66; Letter

from City, ECF No. 110-107.   A letter from the City to Plaintiff explains that while landscaping was provided to the property across the street, no landscaping was provided on her property because it was an undeveloped lot at the time of construction.  *Id.*

On November 4, 2010, almost two years after the completion of the culvert, Plaintiff obtained a building permit from the City to begin construction on a single-family dwelling. Pl. Stmt., ECF No. 106 at ¶ 2–3; Building Permit, ECF No. 104-18.  During construction, Plaintiff's contractors experienced difficulty connecting the Property's water and sewer line to the City's main line.  Pl. Stmt. ECF No. 107 at ¶ 54; Letter to City, ECF No. 110-110 at 2–3.  During the property's excavation, Plaintiff discovered that a catch basin was installed directly in the path of a sewer lateral connection.  Pl. Stmt. 106 at ¶ 20; Laviero Dep., 159:16–160:5, ECF No. 104-22.  Indeed, BL had designed the installation of new catch basins due to the deterioration of the previous catch basins.  Proposed Construction Plans, ECF No. 95-4 at 5–6.

Plaintiff needed to access the lateral connection so that she could connect her Property's sewer line to the City's sewer line.  *Id.*  Plaintiff was ultimately able to access the City's sewer line by relocating the sewer lateral connection and obtaining the water department's permission to connect the sewer line in an area directly above the Property's water line.  Laviero Dep., 161:2–3, ECF No. 104-22.  Plaintiff's frustration, however, is that running a sewer line above a water line is an unsanitary placement.  *Id.* at 161:10–18.  The problems encountered with the sewer lines did not create any additional costs for Plaintiff.  *Id.* at 161:8–9.

Plaintiff completed the construction of the house in 2011.  Pl. Stmt., ECF No. 107 at ¶ 70.  She has never resided at the Property.  Pl.'s Stmt., ECF No. 105 at ¶ 14.  Instead,

she rents the Property to her son for approximately "six hundred and something a month," which is the equivalent of her mortgage payment.  *Id.* at ¶ 15.

In 2014, a scour hole at the downstream end of the culvert and some erosion developed on the Property.  Pl.'s Stmt., ECF No. 107 at ¶ 61.  Plaintiff alleges that the turbulence of the water inside the culvert, combined with the angle in which the water hits the culvert wall, disturbs the dirt bank on her property, resulting in erosion. Laviero Dep., 167:8-25, ECF No. 104-22.  Although the City offered to repair the erosion, Plaintiff has refused to grant access to the Property.  Pl.'s Stmt., ECF No. 107 at ¶ 61.

On March 31, 2017, Plaintiff's attorney sent a letter to the City of Bristol claiming that the reconstruction of the 2008 culvert was done without permission and without obtaining an easement.  Pl. Stmt., ECF No. 105 at ¶ 27; Letter to City, ECF No. 110-125.

## II.    PROCEDURAL HISTORY

Plaintiff commenced her action on November 19, 2018 in state court. [1] The City then removed the case to this federal court.  ECF No. 1.  Plaintiff filed an Amended Complaint on April 8, 2019 (the "Complaint").  Am. Compl., ECF No. 50.  The Complaint lists the City, BL, Schultz, and Hanover Insurance Company ("Hanover") as defendants. Shortly after filing the Complaint, Plaintiff and Hanover filed a stipulation of dismissal. ECF No. 54.  The only remaining defendants include: the City and its individual employees

---

[1] Under Connecticut law, "an action is commenced not when the writ is returned but when it is served upon the defendant."  *Rocco v. Garrison*, 268 Conn. 541, 549 (2004).  The instant action was removed from state court.  A review of the state court docket indicates that Plaintiff served Defendants on November 19, 2018. *See* Return of Service, Dkt. # 100.30, *Laviero v. City of Bristol*, Superior Court of Connecticut, Docket No. HHB-CV18-6049341-S (filed Dec. 3, 2018).  Therefore, Plaintiff commenced the action on November 19, 2018.

(Mr. Veselka, Mr. Strawderman, and Mr. Rogozinski); Schultz; and BL and its individual employee (Mr. Kohl).

On March 23, 2022, the court dismissed Counts Three, Four, Five, and Seven against Defendant Schultz (ECF No. 67), after Plaintiff failed to oppose Schultz's motion to dismiss.  ECF No. 51.  The City, Schultz, and BL have moved for summary judgment with respect to each of the remaining counts of the Complaint.


III.     **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law at issue will determine which facts are material, and only disputes over facts affecting the outcome of the case will preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*  The court must also disregard all evidence favorable to the moving party that the jury is not required to believe.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation of the demeanor of

witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Instead, the party opposing summary judgment must set forth in their response the specific facts, either through affidavits or other materials in the record, showing that there is a genuine issue for trial.  *Dusanenko v. Maloney*, 726 F.2d 82, 84 (2d Cir. 1984).\

## IV.   <u>DISCUSSION</u>

The Complaint lists seven counts: trespass (Count One); common law private nuisance (Count Two); unlawful taking of property under the Fifth and Fourteenth Amendments of the Constitution (Count Three); violation of municipal wetlands regulations (Count Four); violation of Connecticut's Environmental Protection Act of 1971 (Count Five); violation of Connecticut's municipal highway drainage statute, Conn. Gen. Stat. § 13a-138 (Count Six); and negligent infliction of emotional distress (Count Seven). In her statement of facts, Plaintiff admits that she has abandoned her claim for negligent infliction of emotional distress.  Pl. Stmt., ECF No. 107 at ¶ 59.  Accordingly, the court hereby **<u>DISMISSES</u>** Count Seven of the Complaint.

With respect to the remaining counts, the court finds that the majority of Plaintiff's claims (trespass, nuisance, unlawful taking, and drainage damage under § 13a-138) are each time-barred under the applicable statute of limitations.  Moreover, the court finds that the undisputed facts show that the City has not violated wetlands regulations, nor the

Environmental Protection Act by repairing and reconstructing the culvert in 2008.  Indeed, no reasonable trier of fact could find that the City operated without a permit, or unreasonably polluted and impaired wetlands and watercourses.  Accordingly, the court **GRANTS** Defendants' motions for summary judgment on all remaining counts of the Complaint.

### A. Trespass (Count One)

Plaintiff maintains that the City, BL, and Shultz have trespassed onto her property "since 2008 when construction for the new culvert commenced."  Am. Compl., ECF No. 50 at ¶ 66.  The City argues that there is no trespass because the City has both conservation and prescriptive easements to enter the property.  City's MSJ, ECF No. 96-1 at 18.  BL argues that the trespass claim fails because BL never physically entered Plaintiff's property.  BL's MSJ, ECF No. 94-1 at 18.  Finally, the City, BL, and Schultz all argue that the statute of limitations bars Plaintiff's trespass claim.  City's MSJ, ECF No. 96-1 at 10; BL's MSJ, ECF No. 94 at 20; Schultz's MSJ, ECF No. 90 at 9.  Defendants allege that Plaintiff waited nearly 10 years after the completion of the culvert in 2008 before filing her claim in 2018.  Plaintiff's opposition to each of the three pending summary judgment motions, however, fails to respond to any of the arguments that her claim is time-barred under the statute of limitations.  Def.'s Opp., ECF No. 104.  The court finds that, as a matter of law, the statute of limitations bars Plaintiff's trespass claim against all Defendants.

### i. Statute of Limitations

Because trespass is a state common law tort claim, Connecticut's statute of limitations for torts governs the timeliness of trespass actions.  *Wilson v. Midway Games*,

198 F. Supp. 2d 167, 174 (D. Conn. 2022) (citing *Diffley v. Allied-Signal, Inc.*, 921 F.2d 421, 423 (2d Cir. 1990)).   "The applicable statute of limitations for trespass actions is General Statutes § 52-577[.]"[2]   *Rickel v. Komaromi*, 144 Conn. App. 775, 782 (2013). Under that statute, common law tort claims are subject to a three-year statute of limitations, which runs from "the date of the act or omission complained of."  Conn. Gen. Stat. § 52-577.

With respect to defendant BL, the applicable statute of limitations is the seven-year period contained within Conn. Gen. Stat. § 52-584a.  Under that statute, no tort action against a "professional engineer" may be brought "more than seven years after substantial completion" of improvement to real property for any deficiency in the design or planning of such improvement.  BL is a professional engineering firm and Mr. Kohl is a professional engineer.  Thus, the seven-year statute of limitations applies to BL.

In addition to the limitations period, state law also is used to determine "the related questions of what events serve to commence an action and to toll the statute of limitations."  *Wilson*, 198 F. Supp. 2d at 174.  In a trespass action, "the date of the act or omission complained of" depends on whether the alleged trespass is characterized as a continuing trespass or a permanent trespass.  *Rickel*, 144 Conn. App. at 786.  As the Connecticut Appellate Court explained in *Rickel*, a permanent trespass gives rise to a claim "from the time the trespass is created, and the trespass may not be challenged once the limitation period has run."  *Id.*  A continuing trespass, however, "gives rise to successive causes of action each time there is an interference with a person's property" such that "the statute of limitations begins to run anew with each act."  *Id.*  For example,

---

[2] Conn. Gen. Stat. § 52-577 provides, in full: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

a continuing trespass may arise when "the defendant erects a structure or places something on or underneath the plaintiff's land" and fails to stop the invasion or remove the harmful condition.  *Id.* at 787.  "[E]ach day a trespass of this type continues, a new cause of action arises."  *Id.* at 788 (citing *Sanderson v. Heath Mesa Homeowners Assn.,* 183 P.3d 679, 682 (Colo. App. 2008), *cert. denied*, Docket No. 08SC340, 2008 Colo. LEXIS 929 (Colo. 2008)).

In *Rickel*, the court held that a plaintiff alleged facts to support a claim of a continuing trespass where the defendant had planted an invasive bamboo plant that had grown into the plaintiff's neighboring property.  *Rickel*, 144 Conn. App. at 790.  The *Rickel* opinion does not specify the test used to distinguish a permanent trespass from a continuing trespass.  Instead, a test for distinguishing a *nuisance* is set forth: "If a nuisance is not abatable, it is considered permanent . . . . However a nuisance is not considered permanent if it is one which can and should be abated."  The Supreme Court adopted this reasonable abatability test in *Wellswood Columbia, LLC v. Town of Hebron*, 327 Conn. 53, 81 (2017) (determining that a road closure is a permanent rather than temporary nuisance because the closure would "continue indefinitely" and therefore is not abatable).

Although both the *Rickel* and *Wellswood* court cite the reasonable abatability test as applicable to a claim of nuisance, one Connecticut trial court has applied the test to a claim of trespass.  *Emerick v. Town of Glastonbury*, No. HHDCV115035304S, 2015 WL 3684303, at *6 (Super. Ct. May 14, 2015).  In *Emerick*, the court stated that "the reasonable abatability of an intrusive condition is the primary characteristic that distinguishes a continuing trespass from a permanent trespass."  *Id.* (noting that other

16

jurisdictions, including those cited by *Rickel*, consistently use the reasonable abatability test for trespass claims).  In *Emerick*, the court recognized that "[a] trespass is abatable, irrespective of the permanency of any structure involved, so long as the defendant can take curative action to stop the continuing damages. The condition must be one that can be removed without unreasonable hardship and expense. If an encroachment is abatable, the law does not presume that such an encroachment will be permanently maintained. The trespasser is under a continuing duty to remove the intrusive substance or condition. Periodic flooding due to defective construction of a drainage system is a recognized fact pattern in the category of continuing trespass." *Id.* at *6.

Using the reasonable abatability test, the culvert is better characterized as a permanent trespass rather than a continuing trespass.  The culvert is a 9 foot by 6 foot concrete box buried beneath the ground.  Substantial design and construction were necessary to install the culvert.  Although the culvert is capable of being removed from the Property, it would be at an unreasonable hardship and expense.  To the extent that Plaintiff alleges that the culvert has caused continuous injury by eroding her property, the court notes that Plaintiff has refused to allow the City to install riprap designed to prevent the erosion.  The continuing trespass doctrine does not apply to a landowner who refuses to permit a defendant to enter the land to remove the trespassing condition.  *See* Restatement (Second) of Torts § 161, comment d.  Thus, while the culvert may be "the erection of a structure upon the land of another," because it is not abatable, it constitutes a permanent trespass.

A number of jurisdictions recognize that a property invasion constructed for the public's benefit should be characterized as a permanent, rather than a continuing

trespass.  *See, e.g., Kssr Props. v. Bellsouth Telcoms*, No. 1:19-cv-2708-TCB, 2021 U.S. Dist. LEXIS 92982, at *8 (N.D. Ga. Apr. 21, 2021) ("[A] property invasion is considered a permanent trespass or nuisance if an establishment providing a necessary public service would have to be substantially rebuilt or have its basic operations shut down to stop it."); *Johns v. Black Hills Power, Inc.*, 2006 S.D. 85, ¶ 11, 722 N.W.2d 554, 558 (S.D. 2006) ("The clearest case of a permanent nuisance or trespass is the one where the offending structure or condition is maintained as a necessary part of the operation of a public utility.").

In *Rickel*, the court cited to *Sanderson* which also recognizes the public benefit exception.  *Rickel*, 144 Conn. App. at 789; *see Sanderson v. Heath Mesa Homeowners Ass'n*, 183 P.3d 679, 682 (Colo. App. 2008) ("[W]here the property invasion will and should continue indefinitely because defendants, *with lawful authority,* constructed a socially beneficial structure intended to be permanent, the property owner cannot sustain an action for a continuous trespass.").   Moreover, the Supreme Court's opinion in *Wellswood* suggests support for the public benefit exception to a continuing trespass, as the court noted that "unlike the flow of sewage onto one's property or . . . repeated incursion of invasive bamboo . . . ordinances and resolutions are not harms that necessarily should be abated."  *Wellswood*, 327 Conn. at 82.  Structures erected for the public benefit, particularly after a city has undergone the necessary permitting scheme through an affirmative vote of a municipal body after public hearings, are like city ordinances where the court will presume the "propriety of such actions until a requisite showing of impropriety."  *Id.*

The culvert was constructed by the City for the public benefit of storm water management and drainage improvements.  PER, ECF No. 95-8 at 7.  Indeed, the existing culvert and retaining wall were in deteriorated and poor condition.  *Id.* at 6.  BL determined that the culvert's reinforcing bars "have corroded severely" and "weakened the structure substantially."  *Id.*  Moreover, the retaining wall posed "a major potential problem for a portion of the roadway to washout in the event of a major storm."  The culvert and its retaining wall were in obvious need of repair by the City.  Thus, even if the culvert could be considered a continuing trespass under the reasonable abatability test (which it cannot), the public utility of the culvert renders it a permanent trespass under the law.  Thus, Plaintiff is bound by the three-year statute of limitations contained in Conn. Gen. Stat. § 52-577 in her trespass claim against the City, and the seven-year limitations period under Conn. Gen. Stat. § 52-584a in her claim against BL.  As a permanent trespass, Plaintiff's cause of action began to accrue "from the time the trespass was completed." *Rickel*, 144 Conn. App. at 787.  The City completed the culvert in 2008.  However, Plaintiff alleges in her Complaint that "Defendants . . . fraudulently concealed from Plaintiff the existence of the cause of [the trespass] claim so that Plaintiff did not discover the conduct immediately when it occurred."  Am. Compl. at ¶ 69.  Plaintiff claims that she discovered the encroachment in July 2016, only after commissioning a survey of her property.  Laviero Dep., 226:2–9, ECF No. 104-22.

### a.  Fraudulent Concealment

Under Connecticut's fraudulent concealment statute, "[i]ſ any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable

19

therefor at the time when the person entitled to sue thereon first discovers its existence." Conn. Gen. Stat. § 52-595.   In construing this statute, the Connecticut Supreme Court has explained that "to prove fraudulent concealment, [plaintiffs are] required to show that [defendants]: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) intentionally concealed these facts from the plaintiffs; and (3) concealed the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action." *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP,* 281 Conn. 84, 105 (2007).

The court finds that there is no genuine dispute of fact as to the existence of fraudulent concealment.  The public nature of the City's construction of the culvert, which required attendance at public meetings before the IWC, and at least one informational meeting to the public, undermines Plaintiff's allegations that Defendants intentionally concealed the facts necessary to establish her cause of action.   Plaintiff's primary contention is that the City failed to inform her that an easement was required.  However, there is no evidence to suggest that the City's failure to pursue an easement was in furtherance of a scheme to intentionally conceal a trespass claim.  Indeed, the City's failure to inform Plaintiff about an easement is consistent with the City's belief that no easement was actually required.  Moreover, under the terms of Plaintiff's wetlands permit, it was Plaintiff's responsibility to provide the City with an easement to repair and replace the culvert.  Wetlands Permit, Pl.'s Opp. at ECF No. 104-2 (directing in stipulation #19 that Plaintiff must, as a condition of her permit, "[e]stablish a [c]onservation [e]asement.").  The wetlands permit issued to Plaintiff did not create any affirmative obligations on

anyone other than the permit applicant.  Finally, the record is devoid of any fact that would suggest that Defendants intentionally delayed Plaintiff's ability to file a complaint.

Although Plaintiff claims not to have learned of the culvert's encroachment onto her Property until 2016, she reasonably could have discovered the encroachment in 2010. Several months before Plaintiff began constructing her single-family residence on the lot, Plaintiff had the Property surveyed.  *Id.* at 226:13–19.   In her deposition, Plaintiff confirmed that the survey contained the newly constructed culvert.  *Id.* at 225:12–18. Along with the survey, Plaintiff also had her property lines staked. *Id.* at 226:13–16.  The survey and the act of staking her property lines would have revealed more than sufficient information to reasonably conclude that the culvert encroached onto Plaintiff's property. Thus, even if Plaintiff did not immediately discover the encroachment in 2008 after the culvert was completed, the latest possible date on which her claim would have begun to accrue is 2010.  However, Plaintiff did not file her suit against Defendants until 2018. Under Conn. Gen. Stat. § 52-577, Plaintiff's trespass claim against the City and Schultz is time-barred through the three-year statute of limitations for tort claims.  Under Conn. Gen. Stat. § 52-584a, the claim is time-barred through the seven-year statute of limitations against BL as a professional engineer.  The court hereby **<u>GRANTS</u>** summary judgment to the City, BL, and Schultz on Count One.

## B. Nuisance (Count Two)

Plaintiff also alleges a claim of nuisance for Defendants' construction of the culvert, the subsequent erosion of her property, and the unsightly industrial look of the culvert. *Id.* at ¶ 72-76.  As with the trespass claim, all Defendants argue that the nuisance claim is barred by the statute of limitations.

21

The applicable statute of limitations for a nuisance claim based on alleged negligent conduct is Conn. Gen. Stat. § 52-584, which provides that "[n]o action to recover damages for injury . . . to real or personal property, caused by negligence, or by reckless or wanton misconduct . . . shall be brought but within two years from the date when the injury is first sustained . . . and except that no such action may be brought more than three years from the date of the act . . . complained of."

"The nature of a nuisance as permanent or temporary has an important bearing on the running of the statute of limitations. . . . For limitations purposes, a permanent nuisance claim accrues when injury first occurs or is discovered[,] while a temporary nuisance claim accrues anew upon each injury." *Rickel*, 144 Conn. App. at 787 (citations omitted). Determining whether a nuisance is temporary or permanent depends on whether the nuisance can be abated. *Id.* at 788. If the nuisance can be abated, it is a temporary nuisance whereby every continuance of the nuisance accrues a fresh cause of action. *Id.*

As noted above, the culvert cannot be abated without unreasonable hardship or expense. Moreover, like the road closure in *Wellswood*, the culvert, which had existed on Plaintiff's property since 1939, "is one whose character is such that, from its nature and under the circumstances of its existence, it presumably will continue indefinitely." *Wellswood*, 327 Conn. at 82. Therefore, the culvert will not be deemed abatable. Where a nuisance is not abatable, it is considered permanent, and "[t]he statute of limitations begins to run against such a claim upon the creation of the nuisance once some portion of the harm becomes observable." *Rickel*, 144 Conn. App. at 788 (citing Restatement (Second) of Torts § 899). Plaintiff did not file suit in 2008, when she first discovered and

expressed her dissatisfaction at the size and appearance of the completed culvert.  She did not file suit in 2010 after surveying her Property (after the culvert already had been completed and had encroached upon the property lines).  She did not file suit in 2014 when she complained to the City that the culvert was eroding her Property.  Because Plaintiff failed to file her lawsuit within the two-year limitations period for nuisance claims, the court hereby **GRANTS** summary judgment to all Defendants on Count Two.

### C. Unlawful Taking of Property (Count Three)

Plaintiff brings a claim under 42 U.S.C. § 1983, alleging that the City's 2008 construction of the culvert amounts to an unlawful taking of property under the Fifth Amendment.  In response, the City argues that Plaintiff's claim is time-barred under the statute of limitations.

"Since Congress did not enact a statute of limitations governing actions brought under § 1983, the courts must borrow a state statute of limitations." *Lounsbury v. Jeffries,* 25 F.3d 131, 133 (2d Cir.1994).  "The process of determining when a claim accrues for the purpose of applying the statute of limitations to a § 1983 claim is governed by federal law." *Presutti v. City of New Britain*, No. 3:98CV1978 (DJS), 2006 WL 1041842, at *10 (D. Conn. Apr. 13, 2006).  "[A] plaintiff's ignorance of injury does not toll a statute of limitations if, with the exercise of reasonable diligence, the plaintiff could have learned of the wrong prior to the date of actual discovery. *Walker v. Jastremski*, 159 F.3d 117, 119 (2d Cir. 1998).

When analyzing unlawful takings under the Fifth Amendment, courts in this district have applied the statute of limitations under Conn. Gen. Stat. § 52-577, which provides that "[n]o action founded upon a tort shall be brought but within three years from the date

of the act or omission complained of." *See, e.g., Presutti v. City of New Britain*, No. 3:98CV1978(DJS), 2006 WL 1041842, at *10 (D. Conn. Apr. 13, 2006) (applying three-year statute of limitations to unlawful taking claim); *Brisbane v. Milano*, No. CIV.A. 3:08-CV-1328, 2010 WL 3000975, at *8 (D. Conn. July 27, 2010), aff'd, 443 F. App'x 593 (2d Cir. 2011).  Under federal law, a "claim accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994).   As noted above, even if Plaintiff did not realize the City's encroachment immediately upon the completion of the culvert in 2008, she had ample notice in 2010 when she commissioned a survey of her property.  The survey included the culvert, and thus would have provided Plaintiff with the necessary information to bring her claim – that the City had built a culvert that crossed into Plaintiff's Property without Plaintiff's prior permission.  Indeed, Plaintiff was aware throughout the construction of the culvert that she had not given permission to the City for the culvert project.  Plaintiff's own affidavit indicates that her son sent a letter to the City on April 13, 2013 describing their concerns, including "no easement for the newly placed wing wall on private property" and "no conservation easement taken out."  Pl.'s Aff., ECF No. 110 at ¶ 99.  By virtue of the culvert's existence itself, and Plaintiff's subsequent discovery of the wing wall that encroached further into her property than the original culvert, Plaintiff had "reason to know of the allegedly impermissible conduct and the resulting harm" as early as 2010.  Because the statute of limitations requires § 1983 claims to be brought within three years from the date of the Defendants' conduct, Plaintiff's claim is time-barred.  The court hereby **GRANTS** summary judgment to the City on Count Three.

### D.  Violation of Wetlands Regulation (Count Four)

Plaintiff alleges that the IWC has violated the Bristol Inland Wetlands Regulations ("IWC Regulations") by allowing the City to reconstruct the culvert.  Count Four is directed only at the City.  Laviero Dep., ECF No. 95-7, 84:7–12.  Defendant BL, however, spends a significant portion of its motion discussing Count Four "to the extent that [Count Four] or any other count alleges a failure to obtain a water diversion permit from the State of Connecticut or a US Army Corps of Engineers permit for the Project."  BL's MSJ, ECF No. 94 at 32.  The court finds it unnecessary to address BL's arguments as to whether a water diversion permit or a permit from the U.S. Army Corps of Engineers was required for the project.  Plaintiff admits in her statement of material facts that no such permits were required.  Pl.'s Stmt., ECF No. 107 at ¶¶ 15–16.  Accordingly, the court will address Count Four only with respect to the City.

On summary judgment, the City argues that no trier of fact could reasonably conclude that the IWC had violated its regulations by authorizing the repair and replacement of the culvert. Upon reviewing the record, the court agrees.

Plaintiff alleges that the IWC violated Section 6.1 of the IWC regulations, which provides that "[n]o person shall conduct or maintain a regulated activity without first obtaining a permit for such activity from the [IWC]."  IWC Regulations § 6.1, ECF No. 104-3.  However, the City did apply for a wetlands permit to reconstruct the culvert.  *See* City Permit Application, ECF No. 95-13.  On March 17, 2008, the IWC considered Permit Application #1587, the City's application for the "[r]eplacement of the Matthews Street bridge culvert structure and construction of a retaining wall[.]".  *Id.*  IWC meeting minutes indicate that Mr. Kohl explained the deterioration of the existing culvert, and the City's

plan to install a box culvert.  Meeting Minutes, ECF No. 95-10 at 4.  After conducting the public hearing, the IWC voted 7-0 to approve the City's permit.  *Id*.  In her Complaint, Plaintiff alleges that the IWC conditioned the permit on the City obtaining a conservation easement from Plaintiff.  Am. Compl. at ¶ 92.  However, there is no such condition attached to the permit.  The IWC issued the permit to the City with 19 stipulations, and none of them require the City to obtain an easement prior to construction.  Permit Stipulations, ECF 95-11.  While stipulation #14 requires the City to "[i]nstall conservation easement signs (if required)," the remaining stipulations do not require the City to obtain a conservation easement.  *Id.*  There is no evidence to support Plaintiff's claim that "[t]he IWC approved Application #1587 for the wetlands-approved culvert site [ ] on its mandate that Bristol obtain an easement on Plaintiff's property for a Bristol-owned culvert."  Am. Compl. at ¶ 93.

To the extent that Plaintiff is interpreting the easement condition in her own wetlands permit as an obligation on the City, the court rejects such an interpretation.  *See* Permit Application, ECF No. 110-41.  In 2007, Plaintiff applied for a wetlands permit to build a house on her undeveloped lot.  The IWC granted the permit with the following stipulation:

> "19. Establish a Conservation Easement within front and back yard setback. Referenced easements shall allow for the installation of proposed driveway and future repair/replacement of retaining wall/culvert."

Pl.'s Opp. at ECF No. 104-2.  By inserting the above stipulation in Plaintiff's wetland permit, the IWC conditioned Plaintiff's proposed use of her property, the construction of

a single-family home, upon her granting a conservation easement to the City.[3]  Thus, if Plaintiff wanted to develop her plot of land to construct "a new dwelling; driveway; [and] front steps," as indicated in the proposed use section of her permit application, she would first have to grant the City a conservation easement to repair and replace the culvert and its retaining wall.  *See* Permit Application, ECF No. 110-41.  Plaintiff could not have built the house without impliedly granting a conservation easement, particularly when she did not appeal the easement condition in Superior Court.  Moreover, Plaintiff is the landowner, and the easement condition was attached to a permit for which Plaintiff, not the City, had applied.   Thus, it always was Plaintiff's obligation to "[e]stablish a [c]onservation [e]asement."  Because the City constructed the culvert in accordance with its wetlands permit, the IWC did not allow the City to "conduct or maintain a regulated activity without first obtaining a permit." IWC Regulations § 6.1, ECF No. 104-3.  The court hereby **GRANTS** summary judgment to the City on Count Four.

### E.  Violation of Environmental Protection Act of 1971 (Count Five)

Count Five of the Complaint asserts a cause of action for violation of the Connecticut Environmental Protection Act of 1971 ("CEPA"), Conn. Gen. Stat. §§ 22a-16, *et seq.*  Under, CEPA, "any person . . . may maintain an action in the superior court for the judicial district wherein the defendant is located . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction[.]"  Conn. Gen. Stat. § 22a-16.  As stated by the Connecticut Supreme Court, "one of the basic purposes of [CEPA] is to give persons standing to bring

---

[3] The City's regulations expressly allow the IWC to grant a permit application "upon such terms, conditions, limitations, or modifications necessary to carry out the purposes of the [Inland Wetlands and Watercourses Act]."  Inland Wetlands and Watercourses regulations of the Conservation Commission, City of Bristol, § 2.1(a.), ECF No. 104-3 at p. 16.

actions to protect the environment and standing is conferred only to protect the natural resources of the state from pollution or destruction." *Connecticut Coalition Against Millstone v. Rocque*, 267 Conn. 116, 134 (2003) (quoting *Mystic Marinelife Aquarium, Inc. v. Gill*, 175 Conn. 483, 499 (1978)).   A complaint "must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." *Burton v. Comm'r of Env't Prot.*, 291 Conn. 789, 804 (2009).   "[W]hen there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes [unreasonable pollution] under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme." *Waterbury v. Washington,* 260 Conn. 506, 557 (2002).

In Plaintiff's Complaint she claims that "[t]he deposition of untreated surface water, sediment, and debris into the wetlands watercourses on [her] property constitutes unreasonable pollution and impairment of wetlands and watercourses."  Am. Compl. at ¶ 106.   Accordingly, it is the state wetlands act and the City's wetlands regulations that provide substantive content in determining what constitutes unreasonable pollution. *Shukis v. Bd. of Educ. of Reg'l Dist. No. 17*, 122 Conn. App. 555, 581 (2010) (applying wetlands act and local zoning regulations to a claim of unreasonable pollution to the plaintiff's pond).

On summary judgment, both the City and BL argue that Plaintiff has failed to present any evidence whatsoever, whether factual or expert, to support her claim of pollution – let alone unreasonable pollution.  The court agrees with Defendants that the record is devoid of any facts that would support the existence of pollution in the stream

underneath the culvert.  When asked about the pollution, Plaintiff testified to the following at her deposition:

> **Q** But you're talking about the unreasonable pollution. What do you mean by that?
>
> **A** Well, in the summertime the water flow doesn't come down straight into that culvert. It stops right where the culvert ends at the beginning and there's all kinds of little animals and little segments and things in there.
>
> **Q** Like what kind of animals?
>
> **A** I don't know what they are. They're little like pollywogs. They're stuck there. They're not going down in the brook and there's an odor.
> Laviero Dep., 240:15-24, ECF No. 104-22; *see also* Laviero Dep., 104:20-105:9, ECF No. 95-7.

Beyond Plaintiff's own testimony, there is no evidence in the record to suggest "[t]he deposition of untreated surface water, sediment, and debris" into the wetlands.  Am. Compl. at ¶ 106.  Plaintiff commissioned an expert, Vertex, to prepare a report on the culvert replacement project.  However, the report is silent as to any pollution caused by the culvert.  Vertex Report, ECF No. 92-5.  Moreover, Plaintiff has failed to respond to either the City or BL's argument with any facts to support an allegation of pollution. Indeed, Plaintiff has failed to respond to the vast majority of Defendants' summary judgment arguments.  Without any facts to support her claim, Plaintiff's complaint is a mere recitation of the statute.  Accordingly, the court hereby **<u>GRANTS</u>** summary judgment to the City on Count Five.

### F.  Improper Drainage (Count Six)

Plaintiff's final count of the Complaint alleges that the City has violated Connecticut's highway drainage statute, Conn. Gen. Stat. § 13a-138.  Plaintiff directs this count only at the City.  The highway drainage statute provides that:

> "Persons authorized to construct or to repair highways may make or clear any watercourse or place for draining off the water therefrom into or through any person's land so far as necessary to drain off such water and, when it is necessary to make any drain upon or through any person's land for the purpose named in this section, it shall be done in such way as to do the least damage to such land." Conn. Gen. Stat. § 13a-138(a).

Plaintiff alleges that the City improperly maintained and permitted drainage of surface water onto the Property.  Am. Compl. at ¶ 111. She further alleges that the drainage was not done "in such way as to do the least damage" to the land.  *Id.*  The City argues that Plaintiff's claim for drainage damage, as with her other claims, is barred by the statute of limitations.  An action for improper drainage may not be brought "but within fifteen years next after the first occurrence of such drainage."  Conn. Gen. Stat. § 13a-138a (establishing a limitation on actions for drainage damage under § 13a-138(a)).

The City claims that the time for bringing a complaint under § 13a-138 would have been fifteen years after the initial culvert was built in 1939.  According to the City, the newly constructed culvert did not create a new drainage system from a public highway, nor did it create a means to discharge new water onto Plaintiff's Property.  A review of the record reveals that water has been flowing onto Plaintiff's Property since at least the construction of the original culvert in 1939.  *See* PER, ECF No. 95-8 at 5–6.  Thus, "the first occurrence of such drainage" is well outside the fifteen-year limitation period under which to bring a suit.  *See Boyne v. Town of Glastonbury*, No. CV064024371, 2007 WL

2570335, at *2 (Conn. Super. Ct. Aug. 10, 2007) (holding that because water had been continuously flowing on the subject property since the installation of the drainage system in 1972, Plaintiff's claim under § 13a-138 fell outside the limitations period), *aff'd*, 110 Conn. App. 591, 955 (2008).  Moreover, Plaintiff has failed to identify any evidence that would suggest the occurrence of new drainage onto her Property.  Plaintiff's own expert report does not identify surface water drainage as an issue caused by the City's 2008 culvert.  The court finds that Plaintiff would have had to bring a claim by 1954, which is fifteen years after the "the first occurrence of such drainage."  However, she did not file her lawsuit until 2018.  Accordingly, the claim is time-barred.  The court hereby grants summary judgment in favor of the City on Count Six of the Complaint.


## V.     CONCLUSION

The court holds that nearly all of Plaintiff's claims are time-barred under the statute of limitations.  Plaintiff's claims of trespass (Count One), nuisance (Count Two), unlawful taking under the Fifth and Fourteenth Amendments (Count Three), and violation of the highway drainage statute (Count Six) all are time-barred.  The undisputed facts further show that the City has not violated either its own wetlands regulations (Count Four), or the Connecticut Environmental Protection Act (Count Five) by reconstructing the culvert on Plaintiff's Property.  Lastly, Plaintiff has abandoned her claim for negligent infliction of emotional distress (Count Seven).  Accordingly, the court hereby **GRANTS** the pending motions for summary judgment for the City, Schultz, and BL (ECF No. 89, 93, 96).  The clerk hereby is directed to render judgment in favor of Defendants and to terminate the action.

**IT IS SO ORDERED.**  Entered at Hartford, Connecticut, this 29th day of August, 2022.

/s/ Omar A. Williams
Omar A. Williams
United States District Judge